UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ANTHONY T. RIVERA,

          Plaintiff,

    v.

UNITED STATES DEPARTMENT OF
ENERGY,

          Defendant.

Case No.  19-cv-01304-PJH

**ORDER DENYING PLAINTIFF'S
PETITION AND MOTION FOR
SUMMARY JUDGMENT AND
GRANTING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 29, 31

      Plaintiff-petitioner Anthony Rivera's ("plaintiff") petition for judicial review and

motion for summary judgment and defendant-respondent United States Department of

Energy's ("defendant") cross-motion for summary judgment came on for hearing before

this court on January 15, 2020.  Plaintiff appeared through his counsel, Anthony Bothwell.

Defendant appeared through its counsel, Jennifer Wang.  Having read the papers filed by

the parties and carefully considered their arguments and the relevant legal authority, and

good cause appearing, the court hereby **DENIES** plaintiff's motion and **GRANTS**

defendant's cross-motion.

**BACKGROUND**

      On March 11, 2019, plaintiff filed a complaint against defendant with this court.

Dkt. 1 ("Compl.").  In his complaint, plaintiff petitions this court for judicial review of a

decision by defendant that upheld the termination of his employment by a private

contractor of defendant, the Lawrence Livermore National Security, LLC ("LLNS") under

the Department of Energy's Contractor Employee Protection Program, Title 10 C.F.R. §

708, *et. seq.* ("Part 708").  Plaintiff challenges defendant's administrative law judge's

United States District Court
Northern District of California

("ALJ") decision finding that LLNS demonstrated by clear and convincing evidence that, even absent plaintiff's whistleblowing activities, LLNS would have terminated plaintiff because of his misconduct and insubordination.

**A.    Factual Background**

LLNS is a research and development facility operated for the benefit of defendant. Compl. ¶ 1.  From June 18, 1984 to October 16, 2013, plaintiff was employed as an engineer at LLNS.  Id. at ¶¶ 11-12.

For purpose of staffing, LLNS uses a matrix organization, in which employees are assigned to both a "Directorate" (which oversees employees within an area of expertise) and a program.  Certified Administrative Record ("CAR") at 4202-03, 4206, 4330, 4333. Plaintiff's home organization was the Engineering Directorate. Id. The role of the Engineering Directorate is to provide engineering support and personnel to various programs at LLNS.  Id.  A program makes decisions about the support personnel that it needs, and the Directorates supply and deploy the labor requested. Id.

Over the course of his work at LLNS, plaintiff worked on various assignments and developed a range of "skills, knowledge, and assets" ("SKAs"). Id. at 3078-79.   During his time at LLNS, plaintiff received "met" or "exceeded" goals on his performance assessments ("PAs").  Id. at 3053-3058.

In 2011, plaintiff was a 300-series employee within the Laser Diagnostics Group ("LDS") in the Laser Systems Engineering and Operations ("LSEO") Division (one of five divisions in the Engineering Directorate) and was assigned to the National Ignition Facility ("NIF") program. Id. 4206, 4214-15, 4374.

Until 2012, plaintiff reported to Steve Telford, the leader of LDS, id., who, in turn, reported to LSEO Division Superintendent, Ron Darbee ("Darbee"), id. 4407, 4541.  In turn, Darbee reported to LSEO Division Leader, Mark Newton ("Newton"), who, in turn, reported to the Associate Director for Engineering, Monya Lane ("Lane").  Id. 4374, 4207-

08. As provided by the parties,[1] the certified administrative record reflects the following course of events between Fall 2011 and plaintiff's termination on October 16, 2013.

### 1. Fall 2011 – LLNS Issues a Letter of Expectations to Plaintiff After Plaintiff Sends Mass Emails

During fall 2011, managers who worked with plaintiff provided input on his work. Mark Bowers ("Bowers") served as the senior NIF program manager and was a group leader in the Engineering Directorate. Id. at 4331-4336, 4410. At some point, plaintiff apparently learned that Bowers described plaintiff's performance as below his pay grade.

Between November 2011 and February 2012, plaintiff sent a series of emails to groups of managers expressing disapproval of Bowers' purported remarks and criticizing Bowers. Id. at 2516-29, 4334-39. In a November 29, 2011 email to Bowers and various other managers, plaintiff stated the following:

> "A 360 self-review of your management style might be of use to you and the NIF team members you must interact with." Id. at 2520, 4334-37.

On January 30, 2012, plaintiff emailed Bowers and other managers, including Bowers' supervisor Ed Moses, and Parney Albright (Director of LLNS), stating that Bowers' comments were a "nontransparent verbal attack" by LLNS to retaliate against plaintiff for filing a prior complaint in June 2011. Id. at 2521-22, 4338-39. In the email, plaintiff further criticized Bowers' review of plaintiff's work and stated the following:

> "Because Mark Bowers has not yet published papers recently (ever?), hasn't pioneered anything in his field that has yielded new funding, or created new lab programs he is not performing at the PhD level . . . . Furthermore, Mark Bowers does not act in a way that motivates his team members and does not appear to have the necessary traits or temperament for a Leadership position." Id. at 2521-22, 4338-39.

On February 2, 2012, Newton attempted to meet with plaintiff to discuss plaintiff's

---

[1] Plaintiff did an exceptionally poor, incomplete job of citing to the Certified Administrative Record in his briefing. While "[j]udges are not like pigs, hunting for truffles *buried in briefs,* much less buried in disorganized, scattershot evidentiary submissions," Faulkner v. Wausau Bus. Ins. Co., 571 F. App'x 566, 569 (9th Cir. 2014) (emphasis in the original), the court reverse engineered improperly cited evidence to the extent possible and practicable for deciding this motion.

concerns, but plaintiff refused.  Id. at 2525-26, 4339-41.

On February 7, 2012, Newton sent plaintiff a "Letter of Expectations," which stated that plaintiff's emails constituted "improper and prohibited conduct" under LLNS's Personnel Policies Manual and explained that "[c]ritical feedback to managers from employees is essential and acceptable; attempting to professionally malign them is not." Id. at 2516-19.  The letter further provided the following five expectations for plaintiff:

> (1) Cease using emails to address performance disputes;
>
> (2) Stop demanding actions from others that he had no authority to demand;
>
> (3) Work cooperatively and professionally with his managers;
>
> (4) Attend all meetings he was directed to attend; and
>
> (5) Contact the HR department for assistance in developing "personal tools" to help him resolve conflicts and accept negative feedback in a professional manner. Id.

**2. Fall 2012 – Plaintiff Receives a Warning, Refuses to Meet with Managers, and Sends More Mass Emails**

Sometime in September 2012, Darbee became plaintiff's supervisor. Id. at 4374. On September 27, 2012, in a meeting with Darbee and Telford, Darbee informed plaintiff that funding for his NIF position had been eliminated due to purported funding issues.  Id. at 2532-2538, 4215-16, 4419-21.

As a permanent employee, plaintiff would either transfer to a new assignment, if one was available, or become an Employee in Transition ("EIT").  Id. at 2567-68, 4423-25.  As an EIT, his pay would come from an "institutional" budget, and plaintiff would remain an EIT until he found long-term "programmatic work" funded by one of LLNS's programs.  Id.  As an EIT, plaintiff was expected to search for programmatic work while completing identified short-term assignments of institutional value to LLNS.  Id.

At that meeting, Darbee told plaintiff that LLNS had secured a new assignment for him in the Materials Engineering Division ("MED") under the supervision of MED Division

1   Superintendent Roberto Ruiz ("Ruiz").  Id. at 2534, 4429.  The task involved evaluating

2   and updating the design of the interlock safety system for Building 327 ("B327").  Id.

3   2534, 4428-29.

4          On September 27, 2012, plaintiff sent an email to senior managers criticizing the

5   new work assignment.  Id. at 2537.  The next day, plaintiff sent a mass email to over

6   hundreds of employees, stating that Darbee and Telford called him into a meeting

7   "without prior notice," told him of his release from NIF, assigned him to new work "without

8   my input or consent," and referring to the supervisors' actions as "unexpected and

9   inappropriate."  Id. at 2540-41.  Newton testified that such mass emails were "disruptive,"

10  id. at 4367, "in the sense" that other employees "were spending time wondering why they

11  were getting emails like this out of the blue that were disparaging NIF, versus doing their

12  job," id. at 4369.

13         Plaintiff emailed Ruiz and went to Ruiz's office multiple times, seeking information

14  about the position.  Ruiz testified that plaintiff came to his office several times without

15  scheduling a meeting and became upset when Ruiz did not immediately make time for

16  plaintiff.  Id. at 2932-36.

17         On October 2, 2012, plaintiff went to Ruiz's office, and Ruiz asked him to return

18  when he was available.  Rather than meet with Ruiz at the appointed time, plaintiff

19  returned earlier and demanded Ruiz provide him information, purportedly accused Ruiz

20  of not having the requested information, and said he would do a "Stop Work" action.  Id.

21  at 2544-48.  At around 3:55 p.m., plaintiff initiated a safety pause (i.e., an immediate

22  pause in work) in the MED, even though he had not yet begun to work in that division.  Id.

23  at 2546-47, 2557-58.  Engineering Directorate Safety Manager Lisa Tarte ("Tarte")

24  contacted plaintiff immediately after he initiated the safety pause, and plaintiff informed

25  her that he was not at the job location, did not know where the work assignment was

26  located, and had not yet begun work on the interlock system.  Id. at 2550-51.

27         On October 3, 2012, plaintiff sent another email to hundreds of employees and

28  managers.  In this email, plaintiff objected to the MED assignment, calling it an

5

"undefined farce," and stated that he was declining a proposed meeting with Newton and other managers "for the moment" and that he wished to have an attorney present at future meetings with Newton.  Id. at 2540-41.

Around the time plaintiff sent his email, Darbee and Newton located plaintiff at his cubicle and asked if they could talk about the MED assignment.  Id. at 2570, 4346-47, 4441-42.  According to Darbee and Newton, plaintiff refused to speak with them without an attorney and, despite Darbee's request that plaintiff stay, departed his cubicle.  Id. Plaintiff testified that he left because he was preparing to go home on sick leave when Darbee and Newton went to see him.  Id. at 3558-60.  On October 4, 2012, plaintiff sent an email stating that he was on leave.  Id. at 2570.

On October 17, 2012, Newton issued a Letter of Warning to plaintiff.  The letter explained that plaintiff's conduct since September 27, 2012 had been unacceptable, and that plaintiff had acted inappropriately by:

> (1) Requesting a written job description from Ruiz and behaving
>       unprofessionally toward him;
> (2) Refusing to attend the October 3, 2012 meeting; and
> (3) Failing to get a leave request approved before departing on October 3,
>       2012.  Id. at 2575-77, 4349-50.

The Letter of Warning further directed plaintiff to (1) adhere to the expectations in the Letter of Expectations issued in February 2012; (2) cease actions and communications that fellow employees might regard as disruptive or hostile; (3) comply with LLNS's expectations for EIT employees, and (4) approach future job assignments in a cooperative manner.  Id.  The Letter of Warning further specified the following:

> "Refusing to meet with your division management to discuss your job assignments, ignoring clear direction to have a discussion and walking away after repeatedly being given direction to stay is insubordination.  This insubordinate behavior is unprofessional, unacceptable and will not be tolerated."  Id. at 2576.

### 3.     January 2013 – An Independent Reviewer Withdraws After Plaintiff Attempts to Involve Her in His Disputes with Managers

On November 28, 2012, Darbee completed a PA of plaintiff for the September 1, 2011 to August 31, 2012 period.  Id. at 3059-60.  Contrary to the typical process of soliciting employee input prior to finalizing a PA, Darbee issued the final 2011-12 PA without first meeting with plaintiff.  Id. at 2667.  Darbee testified that Telford had written plaintiff's 2011-12 PA, but, when such draft was received by Newton, Newton directed Darbee to work with Telford and "take another shot" at the PA because Newton "didn't feel that it adequately represented some of the problems [plaintiff] had had during the year in his performance and behavior."  Id. at 4483.

The 2011-12 PA criticized aspects of plaintiff's technical performance and time management.  Id. at 3059-60.  The PA further referenced plaintiff's February 12, 2012 Letter of Expectations.  Id.  The PA stated that plaintiff had failed to meet most of those expectations, stated that plaintiff was not communicating effectively, and criticized plaintiff for opting to communicate work dissatisfaction broadly rather than attempting to resolve the conflict at the lowest level.  Id.  The PA also omitted "Laser Theory and Operations" in the SKAs (skills, knowledge, and abilities) section, which had been included in plaintiff's prior PAs.  Compare id. 3059-60 with id. 3057-58.  Newton acknowledged that "it doesn't sound plausible" that, in the matter of a year, plaintiff suddenly lost such skill.  Id. at 4390.  Plaintiff objected to his PA and submitted a memorandum alleging that LLNS's handling of his PA constituted retaliation for his prior 2011 complaint.  Id. 3061-65.

In January 2013, Anna Maria Bailey ("Bailey"), a Facilities Operation Manager in a different part of LLNS, was appointed to conduct an Independent Party Review of two grievances filed by plaintiff, including those related to the PA.  Id. at 2582.  Plaintiff started blind copying Bailey on day-to-day disputes with his managers, despite Bailey's request that he stop.  Id. at 2584-86, 2588-90.  On February 15, 2013, Bailey withdrew as a reviewer, claiming that because of plaintiff's conduct, she could no longer act as a neutral party.  Id. at 2588-90, 4455-58.

**4.      March 15, 2013 – LLNS Suspends Plaintiff for Five Days**

Around January 2013, plaintiff began an assignment for the Joint Acitinide Shock Physics Experimental Facility ("JASPER").  Id. at 3525, 3574.  In February 2013, while performing that assignment, plaintiff was instructed to report to Defense Technologies Engineering Division ("DTED") Superintendent Dan Schumann ("Schumann") to take inventory for the Weapons and Complex Integration ("WCI") program in an area requiring Q-security (top secret) clearance.  Id. 3569-70, 4354-56, 4447-50.  While accounts of plaintiff's exact response differ, plaintiff refused to complete this assignment at that time, citing the need to complete his ongoing preferential programmatic assignment.  Id. at 2579, 2967-68, 3569-70, 4356, 4452.  In his witness statement, Schumann stated that plaintiff went into Schumann's office and said, "I'm not going to do this, this work is below my level."  Id. at 2967-68.

On February 13, 2013, Darbee attempted to schedule a meeting with plaintiff. Accounts of this attempt differ.  Darbee testified that he attempted to meet with plaintiff to discuss the inventory assignment, knocked on plaintiff's office door, and then knocked harder when plaintiff did not answer.  Id. at 4448-49, 2601-03.  When plaintiff came to the door, plaintiff informed Darbee that he was taking sick leave and intended to leave.  Id. Plaintiff did not recall a delay between Darbee's knocking on the door and his opening it, and testified that Darbee was banging on the door.  Id. at 3579-81.  A meeting did not go forward that day.

Darbee, Newton, and plaintiff scheduled a meeting for February 15, 2013.  Plaintiff purportedly called him "obnoxious and incompetent" and suggested that Darbee was responsible for a colleague's suicide.  Id. at 4447-54.  Darby purportedly told plaintiff that plaintiff would begin the inventory assignment after completing the JASPER assignment. Id. at 2579, 4452.  At that time, plaintiff did not agree to perform the assignment.  Id. at 2579, 4452. 4356.  According to plaintiff, Darbee also told him, in response to plaintiff's purported request to work for another manager (Jim Leppien), that "no, I'm going to be your manager until the end."  Id. at 3461.

1      Based on plaintiff's refusal to accept the inventory assignment at that time,

2  avoiding the February 13, 2013 meeting with Darbee, and failure to adhere to the Letter

3  of Expectations, Lane (the Associate Director for Engineering Lane) made a Request for

4  Suspension on February 26, 2013.  Id. at 2601-03.  On March 15, 2013, LLNS issued

5  plaintiff a five-day suspension.  Id. at 2607.

6      **5.      Summer 2013 – Plaintiff Requests Sensitive Information Concerning**

7      **LLNS's High Explosives Application Facility and Makes His Protected**

8      **Disclosures**

9      LLNS contains a High Explosives Application Facility ("HEAF"), which comprises

10  thick-walled metal tanks used to conduct experiments with explosives, and thick windows

11  (known as "port glass").  Id. at 2322, 1812-13. HEAF Facility Manager Brian Cracchiola

12  ("Cracchiola") testified that on July 10, 2013, plaintiff sent an email to one of Cracchiola's

13  direct reports, Dmitry Voloshin ("Voloshin"), requesting financial information relating to a

14  project involving the "HEAF second E-Gun." Id. at 1812-13, 2644-47.  Significantly,

15  plaintiff was not assigned to any project involving the HEAF second E-Gun.  Id. at 3644.

16  Voloshin brought the request to Cracchiola's attention and ultimately did not provide

17  plaintiff with the information.  Id. at 2644-47, 4052-56.

18      On August 16, 2016, plaintiff emailed Darbee (with Newton and two others cc'ed)

19  proposing, apparently for purpose of some assignment, to replace certain "ignitron

20  switches" with safer "spark gap" switches (that would not rely on mercury, which could

21  cause a hazard if damaged) and do so "using the EBA account." Id. 3142-3143.  Darbee

22  testified that he interpreted this email as raising a financing concern, not a safety

23  concern, because "if you thought this was a really big safety issue, you would say, 'I want

24  to stop work.  I want to pause work.  I think [it] is a personnel hazard.'" Id. at 4468.  The

25  ALJ later determined that this email qualified as the "spark gap" switch disclosure.  Id. at

26  4786-87.

27      On August 30, 2013, during an experiment at the HEAF, the port glass broke and

28  gas escaped from the broken window into an area surrounding the tank.  Id. at 4070,

4077-78.  No one was exposed to the gas or injured, and Cracchiola immediately convened a team to investigate the incident.  Id. at 4076-78.

On September 5, 2013, plaintiff emailed Voloshin again for information.  Id. at 2644-47, 4055-4061.  Plaintiff failed to give any material explanation as to the need for the requested information, stating only that he was "purchasing such parts in the near future."  Id. at 2644-47, 4067-68.  Cracchiola then sent an email to his own supervisor, Schumann, advising him that plaintiff requested facility sensitive information of his HEAF team.  Id. at 2649.  In that email, Cracchiola requested that plaintiff cease any such requests and direct any necessary future requests to Cracchiola's office, rather than to his team.  Id.  On September 6, 2013, Schumann forwarded Cracchiola's email to Newton and Darbee, and Darbee conveyed Cracchiola's request to plaintiff that same day.  Id. at 2469, 4473.  On September 12, 2013, plaintiff sent Voloshin another email with a series of questions about the port glass that broke during the August 30, 2013 experiment.  Id. at 2652, 4070.  Plaintiff was not assigned to the port glass project.  Id. at 3657.

Around this same time, on September 6, 2013, plaintiff sent Ruiz an email detailing several concerns identified as part of plaintiff's assignment to evaluate and recommend upgrades to certain safety systems in LLNS's Building B327.  Id. at 3151-3154.  The ALJ later determined that this email qualified as the "B327 Disclosure."  Id. at 4788-89.

On September 16, 2013, Newton and Darbee met with plaintiff to discuss his failure to follow instructions and his continued inappropriate demands of other personnel.  Id. at 2654-56, 4474-75.  The following day, Darbee sent plaintiff a calendar invitation to schedule a draft 2012-13 PA meeting with him for September 19, 2013.  Id. at 2661.

Absent confirmation that a "third party" would be in attendance, plaintiff refused to meet with Darbee.  Id. at 2661.  Earlier that morning, the Associate Director of the Strategic Human Resources Directorate Art Wong ("Wong") advised plaintiff to meet with his supervisor for his draft 2012-13 PA meeting as it would be his opportunity to receive

10

the draft and make comments or suggestions before it was finalized.  Id. at 2667-68.

      **6.     September 20, 2013 through October 10, 2013 – LLNS Terminates**

                **Plaintiff's Employment**

On September 20, 2013, plaintiff was given a Notice of Intent to Dismiss, which included a memorandum from Associate Director for Engineering Lane to Staff Relations Manager Jennifer Szutu ("Szutu"), recommending dismissal.  Id. at 2674-77, 2679-80. Lane's memorandum cited continued insubordination, misconduct, and poor performance in violation of the Letter of Expectations, Letter of Warning, and notice plaintiff received when he was suspended.  Id. at 2674-77.   Under LLNS policy, plaintiff submitted a response to his dismissal and was entitled to Disciplinary Review Board review of his dismissal.  The board agreed with the termination decision and, on October 16, 2013, LLNS terminated plaintiff.  Id. at 2905, 2907, 2909-10.

**B.    Procedural History**

      **1.     Plaintiff's Part 708 Complaint and Pre-Rivera I Proceedings**

Part 708 sets forth a process by which the defendant considers and resolves allegations of retaliation raised by contractor employees.  A contractor-employee may initiate this process by filing an administrative complaint ("Part 708 Complaint") with defendant alleging that he faced retaliation by his employer-contractor for engaging in protected activity.  10 C.F.R. § 708.1.  To the extent necessary, the courts details the applicable procedures below.

On January 14, 2014, plaintiff filed his Part 708 Complaint.  In it, plaintiff alleged that LLNS terminated his employment in retaliation for making certain protected disclosures concerning use of LLNS resources and purported safety hazards at the facility.  CAR at 1-7.

On September 15, 2014, following assignment of an investigator by defendant's Office of Hearings and Appeals ("OHA"), id. at 420, OHA dismissed plaintiff's complaint under Title 10 C.F.R. § 708.5, finding that plaintiff failed to state a claim upon which relief could be granted, id. at 573-79.  On October 23, 2014, plaintiff appealed the dismissal.  Id.

at 584-92.  On March 9, 2015, OHA dismissed the appeal.  Id. at 642-53.

On March 23, 2015, plaintiff filed a petition for secretarial review.  In it, plaintiff sought to require OHA to complete its investigation and conduct further proceedings.  Id. at 654-55.  On August 19, 2016, and as further noted below, OHA vacated its March 9, 2015 decision and reinstated the case for further processing.  Id. at 862-63.

### 2. Rivera v. Lawrence Livermore National Security, LLC, 4:16-cv-0304-PJH ("Rivera I")

On January 19, 2016, pending plaintiff's March 23, 2015 petition for secretarial review, plaintiff filed a complaint in this court against defendant, LLNS, defendant OHA, the United States, and the National Nuclear Security Administration ("NNSA"), as well as certain individuals.  4:16-cv-0304-PJH, Dkt. 38 at 2.  In his complaint, plaintiff alleged, among other claims, a claim against defendant under the Administrative Procedures Act ("APA") premised upon a violation of plaintiff's due process rights.  Dkt. 38 at 2.  On October 31, 2016, following an amended complaint and multiple motions to dismiss, the court dismissed plaintiff's action with prejudice except for his APA claim against defendant, allowing plaintiff to "file a new complaint pursuant to the APA challenging OHA's decision on his administrative complaint once there is a final agency action for this court to review." Dkt. 68 at 10.

### 3. Defendant's Agency Action in Response to the Part 708 Complaint

Following OHA's August 19, 2016 order vacating its March 9, 2015 decision, an OHA investigator investigated plaintiff's Part 708 complaint.  The investigator interviewed plaintiff and 17 other witnesses and reviewed documents provided by both LLNS and plaintiff.  Id. at 2340-42.  On February 17, 2017, the investigator issued its Report of Investigation ("ROI").  Id. at 2295-2342.  The ROI analyzed plaintiff's allegations, concluded that plaintiff failed to satisfy his burden of showing that he engaged in a protected disclosure, and, ultimately, noted that the parties would have an opportunity at a hearing to present additional evidence.  Id. at 2329-39.

From June 13, 2017 to June 17, 2017, an ALJ conducted a hearing on plaintiff's

1    complaint. Id. 4781. As part of that hearing, the ALJ heard live testimony from nine

2    witnesses as well as from plaintiff. Id. at 4781. The hearing also included testimony from

3    additional witnesses through deposition testimony and witness statements. Id. 2505-06.

4         On September 27, 2017, the ALJ issued defendants' "Initial Agency Decision"

5    ("IAD"), a 30-page decision analyzing the allegations in plaintiff's complaint, denying the

6    relief that plaintiff sought, and upholding his termination. Id. at 4769-4799.

7         On October 17, 2017, plaintiff appealed the IAD to the OHA Director, id. at 4803-

8    04, thereby exhausting his administrative remedies under Title 10 C.F.R. § 708.32. On

9    December 14, 2017, the OHA director denied the appeal and affirmed the IAD. Id. 4932-

10   42. On December 22, 2017, plaintiff filed a petition for secretarial review. Id. at 4943-44.

11   On September 28, 2018, defendant's secretary denied plaintiff's petition for failure to

12   demonstrate extraordinary circumstances under § 708.35(d) and reaffirmed the

13   September 27, 2017 IAD, id. 5241-42, thereby rendering plaintiff's termination a final

14   agency decision for purpose of judicial review, § 708.35. The instant complaint followed.

15        At core, plaintiff's motion challenges the reasonableness of the IAD. Rather than

16   detail the IAD's findings separately, the court will discuss them in its analysis as

17   necessary.

18                                     **DISCUSSION**

19   **A.    Legal Standard**

20        In relevant part, Title 5 U.S.C. § 706(2) provides the following:

21        "To the extent necessary to decision and when presented, the
22        reviewing court shall decide all relevant questions of law,
          interpret constitutional and statutory provisions, and determine
          the meaning or applicability of the terms of an agency action.
23        The reviewing court shall—

24        . . .

25        **(2)** hold unlawful and set aside agency action, findings, and
          conclusions found to be—
26
27        arbitrary, capricious, an abuse of discretion, or otherwise not in
          accordance with law;

28        . . .

                                           13

United States District Court
Northern District of California

**(E)** unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute;

. . .

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error." 5 U.S.C. § 706(2).

As indicated by § 706's text, a court's review of the challenged agency action is generally "limited to the administrative record." Lands Council v. Powell, 395 F.3d 1019, 1029 (9th Cir. 2005). A motion for summary judgment may be used to seek judicial review of agency administrative decisions. Nw. Motorcycle Ass'n v. U.S. Dep't of Agric., 18 F.3d 1468, 1471 (9th Cir. 1994).

While the court generally should grant a motion for summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. Pro. 56, such standard is inapplicable here because "the role of the court under the APA is not to 'find facts' but is limited to reviewing the administrative record." Alameda Health Sys. v. Centers for Medicare & Medicaid Servs., 287 F. Supp. 3d 896, 910-11 (N.D. Cal. 2017). "Thus, the usual standard for summary judgment does not apply." Id. at 911.

Instead, "the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did. *De novo* factfinding by the district court is allowed only in limited circumstances . . ." Occidental Eng'g Co. v. I.N.S., 753 F.2d 766, 769 (9th Cir. 1985) (emphasis in the original). Put differently, the court's role is to review the decision of an administrative agency, which "is itself the finder of fact." Id. at 770 ("The appellant confuses the use of summary judgment in an original district court proceeding with the use of summary judgment where, as here, the district court is reviewing a decision of an administrative agency which is itself the finder of fact."). Therefore, summary judgment "is an appropriate mechanism for deciding the legal question of whether the agency could

14

reasonably have found the facts as it did." Id.

"The 'scope of review' provisions of the APA, 5 U.S.C. § 706(2), are cumulative. Thus, an agency action which is supported by the required substantial evidence may in another regard be 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Ass'n of Data Processing Serv. Organizations, Inc. v. Bd. of Governors of Fed. Reserve Sys., 745 F.2d 677, 683-84 (D.C. Cir. 1984) (emphasis in the original).  As a result, "the distinction between the substantial evidence test and the arbitrary or capricious test is largely semantic."  Id. at 684.[2]

To determine whether final agency action qualifies as arbitrary and capricious within the meaning of § 706(2)(A), the reviewing court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  Southeast Alaska Conservation Council v. Fed. Highway Admin., 649 F.3d 1050, 1056 (9th Cir. 2011).

An agency must articulate a "satisfactory explanation" for its action, there must be "a rational connection between the facts found and the choices made," the agency's explanation must be "sufficient to permit effective judicial review," and the reviewing court "should not attempt to make up for deficiencies in the agency's decision."  Nw. Motorcycle Ass'n., 18 F.3d at 1478.  While a court "may not supply a reasoned basis for the agency's action that the agency itself has not given," a court "can uphold an agency decision of less than ideal clarity if the agency's path may reasonably be discerned."  Id.

---

[2] In his opening brief's analysis, plaintiff repeatedly refers to defendant's final agency action as "unsupported by substantial evidence."  Dkt. 29 at 15.  In his brief's Standard of Review section, however, plaintiff cites the "arbitrary and capricious" standard of review set forth at Title 5 U.S.C. § 706(2)(A) as applicable here.  Id. at 9-10.  In its briefing, defendant states that there is "no meaningful distinction" between § 706(2)(A)'s "arbitrary and capricious" standard and § 706(2)(E)'s "unsupported by substantial evidence" standard. Dkt. 31 at 18-19 n. 5.  When questioned about the applicable standard at oral argument, plaintiff's counsel acknowledged that, for purpose of this action, the "substantial evidence" and "arbitrary and capricious" standard are the same.   Rough Hr. Tr. ("It's the same thing.").  Given that the parties agree about the material features of this court's review, and plaintiff fails to show how the action he sues upon satisfies § 706(2)(E)'s additional requirements, the court will refer to § 706(2)(A)'s arbitrary and capricious standard in its analysis.

With the above requirements in mind, the Ninth Circuit has nonetheless characterized the arbitrary and capricious standard as "highly deferential, presuming the agency action to be valid" and actually "***requires*** affirming the agency action if a reasonable basis exists for its decision." <u>Kern Cty. Farm Bureau v. Allen</u>, 450 F.3d 1072, 1076 (9th Cir. 2006) (emphasis added). "Under such deferential review," the reviewing court "may not substitute [its] judgment for that of the agency." <u>Id.</u> Relatedly, the Ninth Circuit has explained that, under the "substantial evidence" standard, courts "must affirm" an agency's decision "unless the evidence is so compelling that no reasonable fact finder could fail to find the facts were as [plaintiff] alleged." <u>Nakamoto v. Ashcroft</u>, 363 F.3d 874, 881-82 (9th Cir. 2004).

As this court has previously stated, then, "[s]ummary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." <u>Alameda Health Sys.</u>, 287 F. Supp. 3d at 911.

**B.     Analysis**

**1.     The ALJ Reasonably Concluded that Clear and Convincing Evidence Showed that LLNS Would Have Terminated Plaintiff Absent His Protected Disclosures**

When plaintiff filed his Part 708 complaint, Title 10 C.F.R. § 708.5 provided that the employee of a contractor of the United States Department of Energy "may file a complaint against your employer alleging that you have been subject to retaliation for . . . (a) Disclosing to . . . your employer . . . information that you reasonably believe reveals . . . (1) A substantial violation of a law, rule, or regulation; (2) A substantial and specific danger to employees or to public health or safety; or (3) Fraud, gross mismanagement, gross waste of funds, or abuse of authority." 10 C.F.R. § 708.5 (Eff. Aug. 23, 2013 to Sept. 30, 2019).

For purpose of § 708.5, "retaliation" means the following:

"an action (including intimidation, threats, restraint, coercion, or

United States District Court
Northern District of California

similar action) taken by a contractor against an employee with respect to employment (e.g., discharge, demotion, or other negative action with respect to the employee's compensation, terms, conditions, or privileges of employment) ***as a result of the employee's disclosure of protected information, participation in proceedings, or refusal to participate in activities described in § 708.5 of this subpart***. 10 C.F.R. § 708.2 (Eff. Aug. 23, 2013 to Sept. 30, 2019).

To evaluate a Part 708 Complaint, an administrative law judge applies the following burden-shifting framework outlined at § 708.29:

"The employee who files a complaint has the burden of establishing by a preponderance of the evidence that he or she made a disclosure, participated in a proceeding, or refused to participate, as described under § 708.5, and that such act was a contributing factor in one or more alleged acts of retaliation against the employee by the contractor.

. . .

Once the employee has met this burden, the burden shifts to the contractor to prove by clear and convincing evidence that it would have taken the same action without the employee's disclosure, participation, or refusal." 10 C.F.R. § 708.29 (Eff. Aug. 23, 2013 through Sept. 30, 2019).

The Supreme Court generally recognizes "three standards of proof . . . ranging from the 'preponderance of the evidence' standard employed in most civil cases, to the 'clear and convincing' standard reserved to protect particularly important interests in a limited number of civil cases, to the requirement that guilt be proved 'beyond a reasonable doubt' in a criminal prosecution." California ex rel. Cooper v. Mitchell Bros. Santa Ana Theater, 454 U.S. 90, 93 (1981). The Ninth Circuit has described the "clear and convincing" evidence standard as "requir[ing] more than proof by a preponderance of the evidence and less than proof beyond a reasonable doubt." Singh v. Holder, 649 F.3d 1161, 1168 (9th Cir. 2011).

In the whistleblowing context, the Federal Circuit in Kalil v. Dep't of Agric., 479 F.3d 821 (Fed. Cir. 2007) specified three non-exhaustive factors to determine whether an employer has shown by clear and convincing evidence that it would have taken an alleged act of retaliation against an employee absent such employee's protected conduct. Such factors include the following:

"1. The strength of the agency's reason for the personnel action excluding the whistleblowing;

2. The strength of any motive to retaliate for the whistleblowing; and

3. Any evidence of similar action against similarly situated employees for the non-whistleblowing aspect alone." Id. at 724.

Although the Ninth Circuit has not expressly adopted these factors, it has cited Kalil with approval for a different proposition. Duggan v. Dep't of Def., 883 F.3d 842, 847 (9th Cir.), cert. denied, 139 S. Ct. 341 (2018). As a result, the court will treat these factors as persuasive.

Here, when applying the § 708.29 burden-shifting framework, the ALJ reasonably concluded that LLNS demonstrated by clear and convincing evidence that—absent plaintiff's protected spark gap switch and B327 disclosures—it would have terminated plaintiff. The ALJ grounded that conclusion in substantial documentary and testimonial evidence showing plaintiff's ongoing misconduct and failure to follow basic directions from workplace supervisors.

### a. The ALJ Reasonably Determined that LLNS Had Sufficient Non-Whistleblowing Reasons to Terminate Plaintiff

Here, when considering the strength of LLNS's reason for terminating plaintiff, the ALJ addressed each of LLNS's proffered justifications, including plaintiff's purported (1) poor performance, (2) misconduct, and (3) insubordination. The ALJ recognized substantial testimonial evidence from other LLNS personnel describing the impressive quality of plaintiff's technical work, as well as plaintiff's 2008-09, 2009-10, 2010-11 PAs, characterizing each as "uniformly positive." Id. at 4791. The ALJ even noted that Darbee testified that plaintiff did "pretty good work." Id. Given such positive technical reviews, the ALJ reasonably distinguished plaintiff's negative reviews on his 2011-12 and 2012-13 PAs as "largely due to [plaintiff's] allegedly inappropriate and insubordinate behavior." Id.

Here, the record supports the ALJ's finding that plaintiff acted inappropriately and insubordinately because of (1) his communications, (2) refusing to meet with managers,

United States District Court
Northern District of California

(3) refusing to accept certain assignments, and (4) failure to follow the requirements set forth in his letters of expectations and warning.  Id. 4791-98.  The court analyzes the reasonableness of each rationale in turn below.

### i.    Evidence of Plaintiff's Communications Support the ALJ's Finding of Insubordination

Here, the ALJ reasonably concluded that plaintiff acted insubordinately through his communications.  As an initial matter, plaintiff cannot dispute the contents of his November 29, 2011, January 30, 2012, and October 3, 2012 emails, each which is shown by the documentary record.  CAR at 2520 (November 29, 2011); Id. at 2521 (January 30, 2012); Id. at 2540 (October 3, 2012 email).  The substance of such emails shows some combinations of poor judgment and disrespect, particularly the email aimed at the PhD credentials of a manager, Bowen.  Moreover, despite plaintiff's apparent position that his emails were not distracting, there is no reasonable dispute that mass emails at a place of employment are workplace distractions, particularly when such an email airs a management grievance in which a majority of the recipients are not involved.

With respect to the February 15, 2013 in-person meeting between plaintiff, Darbee, and Newton, the ALJ assessed each's account of that meeting and reasoned that Darbee's account (that plaintiff called him "obnoxious and incompetent," among other things) was more credible.  Id. at 4794-95.  Such determination is particularly appropriate given Darbee's contemporaneous February 15, 2013 email reciting plaintiff's statement in that meeting that "I've spoken to people all over the lab about you (me) [Darbee] and everyone knows you're obnoxious and incompetent."  Id. at 2579.  Given the above, the ALJ reasonably concluded that plaintiff's workplace communications could form a cognizable basis supporting LLNS's misconduct justification.

### ii.    Evidence of Plaintiff's Refusal to Meet with Managers Support the ALJ's Finding of Insubordination

Here, the ALJ reasonably found that plaintiff acted insubordinately by his refusal to meet with his managers.  Such refusals are supported by the record, including plaintiff's

own emails. CAR at 2540 (October 3, 2012 mass email stating: "*I declined the meeting for the moment*") (emphasis added); id. at 2661 (September 17, 2013 email in response to Darbee's 2012-13 draft PA discussion stating: "If we do meet, I am requesting confirmation from a third party to also be in attendance. . . . *Either way, we are in a holding pattern for now*. Please email my draft PA today for my review so that I can best prepare and respond to its contents.") (emphasis added). Given such documentary evidence, the ALJ did not need to resolve any credibility judgment concerning competing testimonial accounts of plaintiff's refusals to meet on October 3, 2012 and September 17, 2013. Plaintiff's emails speak for themselves. That said, the ALJ did consider such competing accounts and reasonably refused to adopt plaintiff's version or post-hoc excuses for such departures. Id. at 4795-96.

With respect to plaintiff's purported refusal to meet on February 13, 2013, plaintiff himself fails to refute that he left his office when Darbee knocked on his door. Id. at 3581 (Q: "But in any event, you saw him at the office and you said, I'm going home sick and you left, correct? You didn't want to meet with him that day?" A: "I said I was sick. Sick leave is a normal part of approved lab leave."). Given such failure, as well as the undisputed fact that the plaintiff and Darbee did meet two days later (February 15, 2013), the ALJ reasonably treated plaintiff's conduct on February 13, 2013 as a third instance of his refusal to meet with his managers.

Plainly, regardless of its convenience, meeting with one's supervisor is a necessary condition of employment. As stated above, the ALJ found numerous instances where plaintiff failed that requirement. As a result, the ALJ reasonably concluded that plaintiff's refusals to meet with his supervisors could form a cognizable basis supporting LLNS's insubordination justification.

### iii. Evidence of Plaintiff's Refusal of Assignments Supports the ALJ's Finding of Insubordination

Here, the ALJ reasonably found that plaintiff acted insubordinately by his refusals to accept the MED evaluation and inventory assignments. Such refusals are supported

1    by the record. Significantly, documentary evidence shows plaintiff's animus toward the

2    September 27, 2012 MED evaluation assignment. CAR at 2537 (September 27, 2012

3    email stating: "Instead, effective this Monday 10-1-12, I was instructed to report to a

4    NSED contact for *a poorly defined 11th hour assignment* without my prior input or

5    consent.") (emphasis added); id. at 2541 (October 3, 2012 mass email stating: "The MED

6    assignment is *an undefined farce*.") (emphasis added). Given those prior statements,

7    the ALJ reasonably rejected plaintiff's competing account of his effort to learn more about

8    that assignment and instead construe plaintiff's October 2, 2013 "safety pause" (on the

9    systems relating to that assignment) as a tacit refusal to accept it. Id. at 4796-97.

10       The ALJ also reasonably found that plaintiff refused the February 2013 inventory

11   assignment. Plaintiff's resistance to such assignment is shown by contemporaneous

12   documentary evidence. In his February 15, 2013 email memorializing his meeting with

13   plaintiff, Darbee recorded the following:

> "Moving on, I then told [plaintiff] that I had spoken with Albert
> Lee and that his funded assignment would run through next
> week, *at which time Albert would not need him*. I explained
> to [plaintiff] that he was expected to report to Dan Schuman the
> following week to work in the WCI inventory efforts in the B131
> High Bay. I asked him if he understood this direction and *he
> said we'll see what my doctor says*. I asked if he had any
> medical restriction I was not aware of and he told me, *"We'll
> see. Once I describe all the undo stress your [sic] causing,
> my doctor may decide differently. We'll see.*" CAR at 2579
> (emphasis added).

20       In light of this contemporaneously recorded statement, the ALJ reasonably

21   rejected plaintiff's competing account (that he did not refuse this assignment but instead

22   declined to begin it until he had finished his preferential programmatic work with

23   JASPER) to instead construe plaintiff's conduct toward it as a refusal. Such construction

24   is particularly well-founded given that Darbee's February 15, 2013 email also shows that

25   the JASPER manager would not need plaintiff "next week," at which point plaintiff could

26   begin the inventory assignment. Id. at 2579.

27       Similar to meeting with one's supervisor, accepting assignments (including

28   undesirable ones) is a necessary condition of employment. As a result, the ALJ

United States District Court
Northern District of California

1    reasonably concluded that plaintiff's refusals to accept the September 27, 2012 MED and

2    February 2013 inventory assignments could form another basis supporting LLNS's

3    insubordination justification.

         **iv.**       **Plaintiff's Failure to Satisfy the Letter of Expectations and**

                           **Letter of Warning Supports the ALJ's Finding of**

                           **Misconduct and Insubordination**

7        Here, the ALJ found that plaintiff acted inappropriately and insubordinately by his

8    failure to follow the requirements set forth in the letter of expectations and letter of

9    warning. While the ALJ premised this finding upon the above-referenced shortcomings in

10   plaintiff's conduct, CAR at 4798, such finding was still reasonable. Significantly, plaintiff's

11   failure to follow the conditions outlined in those letters—which included that plaintiff

12   "attend all meetings he was directed to attend" (February 7, 2012 Letter of Expectations),

13   "stop demanding actions from others that he had no authority to demand" (February 7,

14   2012 Letter of Expectations), and "approach future job assignments in a cooperative

15   manner" (October 17, 2012 Letter of Warning)—exacerbates the insubordinate nature of

16   his predicate misconduct because such letters gave plaintiff specific notice of

17   shortcomings in his workplace behavior, which he nonetheless failed to correct.

18        Moreover, in response to plaintiff's failure to follow the letter of warning, LLNS

19   issued plaintiff a five-day suspension on March 15, 2013. Id. at 2607. Given such

20   suspension, the ALJ reasonably adopted LLNS's explanation that, short of termination, it

21   had "exhausted every level" of disciplining plaintiff. Id. at 4798. Taken together with his

22   predicate misconduct and insubordination, plaintiff's violations of the specific instructions

23   contained in the Letter of Expectations and Letter of Warning further support that the ALJ

24   reasonably found that LLNS demonstrated by clear and convincing evidence that,

25   regardless of plaintiff's protected disclosures, it would have terminated plaintiff's

26   employment because of his pattern of misconduct and insubordination.

27

28

### b.    The ALJ Reasonably Considered the Second and Third <u>Kalil</u> Factors

Here, the ALJ reasonably concluded that the second and third <u>Kalil</u> factors do not undermine his conclusion that, under the first <u>Kalil</u> factor, clear and convincing evidence shows that LLNS would have terminated plaintiff absent his protected disclosures.  With respect to <u>Kalil</u>'s second factor, the ALJ found that there was "little evidence" of a motive for Lane or Darbee to retaliate against plaintiff "for making the protected disclosures."  <u>Id.</u> at 4798.  Significantly, as the ALJ pointed out, neither Lane nor Darbee "were directly implicated" in such disclosures, <u>id.</u>, and, in his briefing, plaintiff failed to identify any such evidence brought to the attention of but disregarded by the ALJ.  Moreover, while the ALJ recognized "abundant evidence of personal animus between Darbee and Mr. Rivera," he found that such animosity "appears to stem from Mr. Rivera's insubordinate behavior, ***not*** his status as a whistleblower." <u>Id.</u>  Such finding is reasonable given the circumstances at hand and, in his briefing, plaintiff failed to specify any evidence brought to the attention of but disregarded by the ALJ that directly contradicts any such finding.

With respect to <u>Kalil</u>'s third factor, the ALJ observed that LLNS failed to proffer any evidence that similar action had been taken against similarly situated employees.  <u>Id.</u> at 4799.  Defendant did not dispute the accuracy of that observation.  Nonetheless, given the ALJ's finding with respect to the first and second <u>Kalil</u> factors, the court concludes that the ALJ reasonably concluded that such factors supported a clear and convincing showing that LLNS would have terminated plaintiff absent his protected disclosures.

### c.    Plaintiff's Specific Critiques of the ALJ's Analysis Do Not Establish that He Acted Arbitrarily or Capriciously

Lastly, in his briefing, plaintiff identifies numerous purported shortcomings in the ALJ's analysis.  Such shortcomings primarily include the following:

- LLNS's explanation that plaintiff engaged in misconduct and insubordination derive from Darbee, and his testimony was not corroborated by other witnesses.  Dkt. 29 at 11, 17-20.

- The other witnesses who testified in support of firing plaintiff were managers with no personal knowledge of plaintiff's purportedly poor performance and misconduct. Id. at 11, 15-17.
- The ALJ ignored evidence of the following:
  - Ruiz "praised" plaintiff. Id. at 12.
  - Darbee altered plaintiff's 2011-12 PA and improperly omitted positive reviews. Id. at 13.

Boiled down, plaintiff's critiques dispute how the ALJ weighed the evidence. In this motion, "the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did. Occidental Eng'g Co., 753 F.2d at 769. Plaintiff's specific evidentiary critiques do not alter this court's determination that the ALJ acted reasonably when concluding that, under the above-referenced Kalil factors, clear and convincing evidence shows that LLNS would have terminated plaintiff absent his protected disclosures. Indeed, despite plaintiff's disputes with how the ALJ weighed specific **testimonial** evidence, the administrative record includes ample **documentary** evidence—including various emails by plaintiff himself—that supports the ALJ's various findings that plaintiff acted inappropriately in his workplace interactions. Such findings formed the basis for the ALJ's ultimate conclusion concerning plaintiff's termination. As a result, plaintiff's specific credibility related disputes aside, the ALJ did not act arbitrarily or capriciously when finding in favor of LLNS on plaintiff's Part 708 complaint.

### 2. Plaintiff Cannot Challenge His Termination on Any Purported First Amendment Ground

Distinct from his challenge to the ALJ's decision under the arbitrary and capricious standard, plaintiff challenges that decision under the First Amendment. Dkt. 29 at 21 ("LLNS, A Federal State Actor, Is Prohibited from Punishing an Employee for Exercise of First Amendment Free Speech . . . Communications that come within the scope of the First Amendment protection of freedom of speech also may not serve as the basis for

adverse action against an employee of a public agency or state actor."); Dkt. 33 at 4-9.

In his briefing and at oral argument, plaintiff failed to articulate how any such purported constitutional violation related to his complaint's underlying Title 5 U.S.C. § 706 claim (if at all). That failure aside, it appears there are two ways of understanding plaintiff's First Amendment arguments. Analyzed below, neither is persuasive.

### a. Plaintiff's First Conceivable Theory of a First Amendment Violation Fails

First, plaintiff appears to be alleging a <u>Bivens</u> claim for violation of his First Amendment rights because LLNS terminated his employment in response to his protected disclosures. This construction has numerous issues. Significantly, plaintiff failed to provide any indication that he exhausted his administrative remedies concerning any such claim and, based on the IAD and Part 708 Complaint, it appears plaintiff has, in fact, failed to do so. Additionally, in his complaint in this action, plaintiff requests only judicial review of the IAD and fails to allege any <u>Bivens</u> claims, much less refer to a First Amendment violation. Plainly, any attempt by plaintiff to belatedly add such a claim in his briefing at this stage in the litigation is improper. As a result, to the extent plaintiff's First Amendment argument attempts to allege a <u>Bivens</u> claims, such attempt fails.

### b. Plaintiff's Second Conceivable Theory of a First Amendment Violation Fails

Second, plaintiff appears to be asserting that the ALJ based his decision on a justification barred by the First Amendment. Under this theory, plaintiff's mass emails qualify as protected speech under the First Amendment. A fortiori, the theory goes, such communications may ***not*** form the basis for plaintiff's termination.

While this construction navigates around the prudential concerns troubling the first construction noted above, it does not change the validity of the ALJ's decision. Significantly, to compel this construction, plaintiff must show that LLNS took state action when terminating him. When asked at oral argument, plaintiff identified two theories of state action by LLNS: (1) joint action and (2) government nexus. Rough Hr. Tr. (Q:

"There are four ways to show state action. . . . Which of the four are you arguing applies here?" A: "The governmental nexus as well as joint action."). In support of each of these theories, plaintiff relies heavily upon LLNS's purported prior partnership with the University of California ("UC"). Dkt. 29 at 21. Plaintiff failed to show that LLNS took state action under either doctrine.

### i. Plaintiff Failed to Establish Joint Action by the State and LLNS

Under the joint action doctrine, courts "consider whether the state has so far insinuated itself into a position of interdependence with the private entity that it must be recognized as a joint participant in the challenged activity. This occurs when the state knowingly accepts the benefits derived from unconstitutional behavior." Kirtley v. Rainey, 326 F.3d 1088, 1092 (9th Cir. 2003).

Here, plaintiff failed to show or explain how his termination qualifies as state action under this test. Significantly, plaintiff failed to proffer evidence showing that either California or the federal government has "so far insinuated itself into a position of interdependence" with LLNS for purpose of his termination—much less that it "knowingly accepted" the benefits of his purportedly unconstitutional termination. Plaintiff's vague and unsubstantiated references to the UC and the Department of Energy's relationship with LLNS at the Livermore Lab (Dkt. 29 at 21-23) do not satisfy the required showing. As a result, the joint action doctrine does not support a finding of the state action necessary to substantiate the second construction of plaintiff's First Amendment challenge.

### ii. Plaintiff Failed to Show a Nexus Between LLNS and the State

"Arguably the most vague of the four approaches" recognized by the Ninth Circuit for determining state action, the government nexus doctrine "asks whether there is such a close nexus between the state and the challenged action that the seemingly private behavior may be fairly treated as that of the state itself." Kirtley, 326 F.3d at 1094-95.

Here, plaintiff similarly failed to show or explain how his termination qualifies as state action under this test. Significantly, plaintiff failed to proffer any evidence showing the government's involvement in his termination. As a result, the government nexus doctrine does not support a finding of the state action necessary to substantiate the second construction of plaintiff's First Amendment challenge.

Independent of the analysis in Section (2) above, even if the court were to find that LLNS took state action when terminating plaintiff (and unconstitutionally did so on the basis of his assumedly protected emails), such finding does not disturb the separate *conduct*-related justifications for plaintiff's termination. As detailed in Section (1)(a), the ALJ reasonably found by clear and convincing evidence that LLNS properly terminated plaintiff because of his refusals to meet with his supervisors, his refusals to accept assignments, and his failure to follow the Letters of Expectation and Warning, and that it would have done so absent plaintiff's protected disclosure. In short, plaintiff's First Amendment challenge—even if valid—would not alter this court's prior conclusion that the ALJ did not act arbitrarily or capriciously by resting his decision, in part, upon an "unconstitutional" justification for plaintiff's termination.

### CONCLUSION

For the above reasons, the court **DENIES** plaintiff's motion and **GRANTS** defendant's motion.

**IT IS SO ORDERED.**

Dated: March 30, 2020

/s/ Phyllis J. Hamilton
PHYLLIS J. HAMILTON
United States District Judge